Today, and this has got a couple of appeal numbers on it too, CCWB Asset Investments, LLC v. Milligan. And we got several lawyers in that one too. And we're going to start out with Ms. Miller. Yes, your honor. Good to have you with us. You may go ahead. You may proceed. Who do you represent? I represent a group of appellants referred to in the papers as the Coniton appellants. And there are 2 separate appeals within from the same district court action here and 2 different groups of investors who are challenging certain aspects of the distribution in a federal court receivership. And that receivership was imposed over the assets of the principles of a Ponzi scheme. 3 gentlemen named Meryl Ledford and Jizersky. Involved in prosecuting or suing over the Ponzi scheme? Involved in trying to put up the money. Recovery well, I represent investors who are just claimants in the receivership. And the dispute here, there are 2 separate disputes between 2 groups of investors and the receiver about the way the receiver. Mass up there. Absolutely. It was a large Ponzi scheme and all of our clients are victims and there are no bad. There are no villains in this room. Your honor. The villains are in prison. Fortunately, but there are real questions raised about how those assets should should be distributed. And that's what these appeals are about. And lost money in the, in the Ponzi scheme. Want to get as much back as they can. That's correct. Your honor. And you don't like the way judge Bennett divided it up. That's right. Your honor my clients in particular. Had earlier brought a state toward action against what we refer to as a feeder fund. Uh, now Kevin Merrill, the ringleader of the Ponzi scheme was in Towson, Maryland, but he had these feeder funds around the country relationships with various securities professionals, people who would steer investors his way. And what my clients did is we didn't bring a civil case case against. The people in the Ponzi scheme, because the receiver was taking care of that, but we brought a separate state court action against the feeder on in Bethesda, Maryland, claiming that these people violated the Maryland securities act and various. Uh, say, common law theories and anyway, my clients made a recovery in that state court action. That recovery did not come out of the receivership. None of the defendants in that action are parties receivership, but they did get back some of what they lost in the investment. And what happened later is when they put in their claims in the receivership, the receiver said, well, I'm going to dock you dollar for dollar for every dollar. You get recovered in the state court case. And they call it a set off, and he did it on a 100% basis. If you got back a dollar in the civil case against the feeder fund that is treated just as if you were paid that money by the criminals in the Ponzi scheme. That's how he did it and we recognize that. District courts give a fair amount of discretion to receivers and how they craft these plans of distribution. And we also understand that this court required under the equity standard of review to give some amount of deference to what district courts do. But there's a point at which things go too far and things become unfair, and they're no longer equitable. And this is that case. And we start with and 1 thing that I think all sides will agree is there's not a whole lot of law on the extent to which a set off is appropriate or permissible in a federal receivership. I think collectively, the parties site for cases. 1 of them gets a fair more attention than the others because it's the only circuit court opinion on the issue. It's a case called capital consultants and capital consultants to 9th circuit case from around 2002. And in that receivership, the receiver initially wanted to do 100% set off like, like the receiver to here dollar for dollar. You get a dollar from a collateral recovery. We're going to knock it down in your distribution. But ultimately, the receiver changed his plan. And negotiated with with certain objecting. Claimants, and it went down to 50%, which is a big difference. And another factor that made it different is they didn't treat it as if you got paid the money out of a Ponzi scheme. They basically deducted it out of the money in and treated it the collateral recovery as money. You never invested in the 1st place, which makes a big difference in how it impacts the distribution. And the 9th circuit approved that plan of distribution as revised by the receiver with the 50% set off and mitigating elements, such as treating it as money not put in. And 1 thing that 9th circuit said, and this is very important. I think the set off is okay because it still leaves the investors enough of an incentive to pursue their own remedies against other defendants. And we do care about that. And the 9th circuit says that in the case that we do care. And the receiver doesn't seem to dispute that even the receivers brief acknowledges that there should be enough incentive left for people in my client's position to bring cases in state court. And, you know, the background rule for starters, we don't believe the court that. The set off should happen at all the background role and conventional litigation as referenced in the collateral source rule is that typically you recover from another source. It doesn't affect your right to recover an appending case. Same thing in bankruptcy court. We don't look at what you've gotten elsewhere. You look at how much money you've lost and you're treated the same. It really ought to be the same in receiverships and there's no reason we should have a different role. But even if we do allow set offs to happen in some circumstances, they have to be tempered. They have to leave enough of an incentive for litigants to pursue 3rd parties who are not in the receivership at all. And frankly, we discussed the cases. Concerning federal receiverships is indicated and capital consultants was a 50% set off with some mitigating measures. Um, we cite the credit bank corp case in which the receiver put in no set off at all and the court approved it. We don't we agree with the receiver. You shouldn't have these set us because we want people to be incented to bring their own cases. Against culpable parties who can broaden the pool of resources available to claimants. There are 2 cases district court cases that were cited by the receiver below. I did in which the receiver did impose 100% setups, but both of them were tempered by various measures to mitigate the effects of those on investors such that there still should have been enough incentive for investors to go forward. So, what does the receiver have to say in his brief? Well, the receiver says, well, we didn't harm. Ms. Miller's clients, we didn't take any money back from them. They're not in a worse position. That's literally in their brief, but that's not that's not enough. That's not enough of incentive for people to go into the going to court for lay people to get involved in this process, which is very intimidating for them. The other thing the receiver says, well, we are slightly better off as a group. Ms. Miller did get them a little bit more money than they would have gotten if they had just sat on their hands and waited for the receivership, but it's not that much more money. Most of my clients got absolutely nothing in this receivership and using the receivers own calculations. They only did 9 to 10% better in terms of the percentage of. The receivers methodology under the rising tide method, and that's not enough of incentive to go into court. And I can tell you personally, it's not enough because I know my clients. I talk to them. They are not happy. Now, I thought they were ecstatic after I got them the settlement. I got them a settlement. That is better than most standards in any securities case, and I think they know I worked very hard for them and I took and the case is very important to me when they file these claims in the receivership and basically told what they could do with their claims. They were angry. They were not happy. They do not want to go back to court again in their whole lives. They are not happy with the marriage and judicial system. And I don't think they're happy with me. And that hurts me. This is a direct attack on what I do for a living. I don't see the plaintiff's bar. As a bunch of parasites who are racing the receiver of the courthouse, we didn't race anybody to any courthouse. We went to a different courthouse and we sued different defendants and we did something that is undisputedly good, even in the receiver's view. We help the receiver in the sense of broadening the total pool, especially if there's 100% set off, right? My clients don't even get to keep what they gained. And people should be incented to bring lawsuits and against culpable parties and simply allowing them to keep 9 or 10 or 15% of what they recovered is not enough of an incentive. It just is my clients include 2 doctors from Texas who had just to lose 2 days of their practice to come for a deposition, a gentleman in San Diego had to fly twice for his deposition in Washington, a retired woman in the Philly suburbs, who's afraid to get on the train or drive by herself, had to have a friend driver to the deposition, and she's scared to death of the prosecution. These people aren't going to want to go back to a court again after this experience. And the incentive simply isn't enough. And look, what should have happened below is what happened in capital consultants. I told the receiver so many times, I'm happy to talk to you. This doesn't have to be one extreme or the other. There are any number of possible intervening outcomes. We outlined these outcomes in an exhibit we filed in the district court, and it's in the record at JA 313. There are a lot of things that could have happened. They didn't happen. The receiver didn't call me. The receiver's attitude was. I'm going to steamroll you because I'm the receiver and I can do whatever I want. And I understand we give a fair amount of deference to receivers. In the ordinary course of business, there are good reasons to get deference to them. The deference has to end somewhere and should end right here and right now. Thank you. Thank you. Ms. Gladberg? Yeah. Good morning, your honors. I represent appellants CCWB and MC Dean. And this case is entirely separate from the case that Ms. Miller just presented. This is a case of first impression in this circuit, and it concerns the application of Judge Posner's reasoning in the Huber case to reinvestments under the rising tide methodology distribution. You take the same position as your colleague just argued? No, we are entirely separate. Completely different position. You're talking about something that Judge Posner said? Yes. We are here because the district court. But you would agree that that's dicta, right? It's definitely dicta. It's not the holding of the case. And we think that is not the holding of the case. It's dicta. It's not binding on the district court. And it's a distraction in the receiver's brief to go into such an extent about the dicta. Because the bottom line here is, it's for this court to decide, is Judge Posner right, that reinvested amounts should be treated as rescinded? Because if he is right, if that's correct. Bennett first decide. Yes, it was for Judge Bennett first to decide. Correct. But the principle is he's representing people in criminal cases. Correct. But Judge Posner laid out this principle. Yes, yes. Yes. Question for us, we're reviewing what he did for abuse of his discretion. Yes. And we believe he... We don't have a de novo review of what he did, do we? No, you're right. It is abuse of discretion. So you have to be claiming that Judge Bennett abused his discretion in ruling as he did in connection with this file. That is correct, Your Honor. Judge Bennett reached the wrong... And if you do it... If we would agree with you and do it differently, that would mean that there'd be... Some people get more money than Judge Bennett gave to him and some people get less. There's the same amount of money that's going to be debited. Let me address that because I think it's important here to note that Judge Bennett actually teed this issue up quite cleanly for this court. He teed up this issue very nicely, yes, for this court because he ordered the receiver to set aside $9 million to deal with these claims of our clients. And so that means that the distribution plan, the interim distribution that the receiver has already made is not going to be touched. So it doesn't affect the payments that have already been made. And he also held on the record that other investors who made reinvestments have waived any objection to the treatment of those reinvestments by not timely raising them. So it's just these two appellants here whose reinvestments are at issue. Now, if we affirm... If we were to affirm Judge Bennett, what happens to this $9 million? That gets distributed, I guess, or the receiver puts it back in the pool to be distributed and later... Back in the pool. Into the pool. You don't want to move that, do you? I just... I don't know. You can ask the receiver, but I assume all the money gets paid and the receiver has a whole system for the different classes of claims. So the expenses get paid first, I think, and then it gets down to eventually claim class four, which are our claimants, and amounts left get another interim distribution or final distribution. And wouldn't it have been... Most of the people lost money getting, what, 30 cents on the dollar or something like that? The first interim distribution was around a 49%. Everybody could get at least 49% in the first distribution. And there is additional money, quite a significant amount, and I don't know how much that will go up for the second. Finite amount of money. There is a finite amount of money. But I mean... If one person gets more money, somebody else is getting less. Yes. But the point here is it's extremely unfair to treat amounts that were reinvested, put back into the Ponzi scheme, as having been recovered and retained, which is how the receiver is treating it. But under the method that the receiver used, didn't that method yield, I guess, the greatest distributions to most of the claimants? So we don't dispute... Yes, Your Honor. We don't dispute the rising tide method itself. It's just that the receiver is applying it incorrectly when it comes to reinvested amounts. So our clients, for instance, the receiver is treating CCWB as having recovered 51.39% of its investment in the Ponzi scheme, when in fact it only recovered around 7%. And the receiver knows... Ms. Klineberg. Yes. Ms. Klineberg, excuse me. With regard to the reinvestments, prior to the reinvestments, they actually had the money, your clients, did they not? And they elected to reinvest. So why was it an abuse of discretion for the judge to say, well, you had the money. You could have bought some shares of Apple, but you decided to reinvest. You had the money. And so why wasn't that a logical thing for the judge to think about when he had the whole pool of investors to worry about maximizing their returns? Yes, Your Honor. So two points there. It was an abuse of discretion to find there is a choice of what to do with withdrawn funds before they are reinvested. There is no benefit there. There's no support for that notion that that's somehow a benefit. And if it is a benefit to have the choice of what to do with money that was withdrawn before it's reinvested, then it is likewise a benefit to have the choice of what to do with money that's already invested, whether to withdraw it, whether to leave it invested. And the point is that all investors had that same benefit of choice. So they didn't have the physical possession of the money the way your clients did prior to their reinvestment. They could have requested to where they could have made withdrawals as well. So it's just this notion that having this choice for some amount of gave them a benefit. It's just an imaginary benefit. And Judge Posner recognized that in Huber that reinvestments is a significant feature of Ponzi schemes. I mean, that's how they keep going is to get these investors to reinvest. And so the fact that our clients were defrauded twice, it was just it's just not a benefit and that we have to recognize how do treat reinvestments in Ponzi schemes. And I'd also point out that under the rising tide method, as Judge Posner explains in Huber and the receiver relies on Huber for this purpose, the idea is that investors who took withdrawals and kept them received a benefit at the expense of other investors. And we agree with that. But investors who reinvest the money actually increase the size of the pool of money available to other investors. And the receiver is using our clients reinvestments to subsidize distributions to other investors. And he's treating our clients as having recovered amounts that are actually being used to pay other investors in this distribution plan. So let me ask you this because part of what the receiver is saying, I think the district court is this whole argument of administrative difficulty. And I think it's your position in your brief that you said that it's not necessary to trace the flow of funds. I'm just curious about how you come to that conclusion. Yes, yes. I'd love to get to that. So that this the receiver is manufacturing this confusion in his brief. And we and we know that because if you look at the receiver's brief, he's insisting on including a dismissed party, EBC, not even in a party to the appeal. And that just creates this illusion of administrative difficulty. But to get to your point, the there's no need to trace here. This is just not complicated. And that's because the principle of treating reinvestments as rescinded applies to the total amount reinvested. And we know that number and those numbers are in the receiver's experts declaration. Mr. Eric White, he has all the numbers already ascertained that we need to determine the total amount reinvested. So he gives us a number for CCWB, for example, he gives us a 22 million dollar number. That's the total invested. That includes the amount of reinvestments. So how much was reinvested? Well, that's the amount of withdrawals, a number he gave us, because we know the withdrawals were all reinvested, less this small amount of disbursements, which we also don't dispute, which is $683,370 number. So just using the numbers from the receiver, which we don't dispute. I see I'm over my time. Can I finish the thought? Thank you. Thank you, Judge King. With just using the numbers that the receiver has, we can determine current recovery using the and there's no need to trace. Thank you, Your Honor. Thank you. Mr. Solomon, you represent the receiver? I do. May it please the court. Danny Solomon on behalf of the receiver, Gregory Milligan. This appeal is not about the best approach to take in an equitable receivership. At this court, we're starting from scratch. The receiver made tough choices about how to distribute fair and reasonable distribution plan. These choices are now entitled to much deference. Because this court cannot form a definite and firm conviction that the district court made a clear error of judgment, the district court's order should be affirmed. I'll start with the Dean Investor's Appeal. This appeal is not a referendum on the maximum balance approach. The question for the court is not whether reinvested withdrawals should always be treated as money that never went in the first place and retaining their maximum balance. The question for this court is whether the district court abuse its discretion in rejecting it here. And three reasons support the district court's discretionary decision. First, the maximum balance approach has no precedential value. Second, it would be administratively difficult to apply. And third, the Dean Investors benefited from withdrawing funds, even if money was reinvested at some point later. So we'll start with the idea of precedent. The maximum... How long did this fund scheme go on? For a number of years, the Dean Investors invested for... What number? I think at least three years it went on. How many? At least three. Three years? Yeah. And was it headquartered or centered in Baltimore? I think there was one who was based in Baltimore, another... It was like three ringleaders. One, I think, was based in Texas, but they ensnared people across the country. It was over $345 million that they collected. And who were they preying on? Who were the so-called investors or victims? I think all types. National people? All types of people, Your Honor. Most of them sophisticated? I think many were. The Dean Investors certainly were. They're part of the Dean family of Virginia, who are part of a billion-dollar electrical company. And there's also people with retirement savings. And so I don't think they discriminated on the types of people that they preyed on. So the... I don't know. Many were. The Dean Investors, I think, are definitely part of that group. They were sophisticated investors. They invested millions and millions and millions of dollars. The three Dean entities were the top five largest investors in the Ponzi scheme. And just while we're on the topic... These ringleaders ended up in the penitentiary? Yes, Your Honor. Were they tried in Baltimore? Were they played guilty? What happened? They were in front of Judge Bennett. I'm not sure if they were tried, but they might have played guilty. The criminal cases or proceedings were handled by Judge Bennett. Yes, Your Honor. Okay. But he knew all about this thing. He was dealing with this case for years. He was the expert in this thing. Yes, Your Honor. So the maximum balance approach has never been endorsed or adopted by another court to date. The only district court to consider it after Huber rejected the Dean Investors' reply brief ignores SEC v. Ferracci, the case out of the District Court of Connecticut, where an investor there deposited $2 million into a Ponzi scheme, withdrew that $2 million a month later to analyze the funds, and then four days later put that $2 million back in. This case was as good a case as any to apply the maximum balance approach, yet the district court rejected it as unpersuasive dicta that has never been endorsed or adopted by another court to date. That case went up on appeal, and the Second Circuit affirmed in Horwitt. And no, the court didn't mention Huber or the maximum balance approach, but the parties briefed it extensively, and the court held that there was no abusive discretion in treating the transfer back to the investor as a distribution under a Ponzi scheme and to treat each of these three transactions separately. And even before Huber, there was a case out of the Northern District of Georgia, the Cotham Advisors. Both of these cases are cited in the brief, where the court held that the transfer out of the case, out of the Ponzi scheme that was put back in, should be treated as separate transactions. And so essentially, the dean investors are asking this court to find that Judge Bennett abused his discretion in rejecting an approach that's never been applied, that's been rejected by two other district courts, and then the Second Circuit affirms. And so we don't need to decide whether Judge Posner's right or whether the logic and equity of the maximum balance approach. We just need to decide whether Judge Bennett abuses discretion in rejecting this approach, which has never been applied before. This Judge Posner thing is like a red herring? I don't know if it's a red herring. I mean, Judge Posner, as he's wont to do. That's what a red herring is. I mean, he's... That's my definition of state. It's not uncommon for Judge Posner to... Did these... What kind of prison sentences did these fellows get? I think pretty good ones. I don't know offhand. I think it was pretty significant. Did they cooperate and give you depositions, you think, the receiver to help you out? So the receiver was... The SEC handled the criminal proceedings. The receiver was appointed by the court after the criminal proceedings to marshal, preserve assets, and then distribute it. Receiver was appointed by Judge Bennett? Correct. And we report to the SEC, who also has influence on the distribution plan. SEC? The SEC, Securities and Exchange Commission. So... They had jurisdiction over these fraudulent stock transactions and stuff. That's right. It was fraudulent debt portfolios they were selling. Yeah. It was a mess. It was a mess. It went on for a long time. So to turn to my second point about administrative difficulty... You're pretty confident that you found all the money that was available? We have not found nearly close to all the money, Your Honor. I think at this point, there's recovered about $100 million. Some of that went to administrative expenses and for the receivership, but we have another... $50 million has been distributed, and there's another $24 million. These crooks haven't been deposed and cooperated with? Which folks? Pardon? The crooks. Oh. The ones that were prosecuted, they haven't cooperated with you and helped you find all the money. Well, a lot of the money is in casinos or it's just lost. Well, did they tell you that? I'm not sure, Your Honor. We've investigated their houses and we've marshaled assets and we recovered a lot of items. The receiver's satisfied that he's found as much money as he can find. We're still working on it. We initiated a call. Still working on it. We brought callback receivings to recover net winnings, which we'll speak about when I get to the condensate investors. That's a way to get somebody who had losses, get them more of a distribution, for the receiver to find more money. We are sitting on a good chunk of money and there will be another distribution. The condensate investors and the dean investors will likely recover some more money when the receiver makes the next interim distribution. Turning to the point about administrative difficulty, the maximum balance approach was not grounded in the facts of Huber. The dean investors can't say that Judge Posner would have applied the maximum balance approach if faced with the same facts as we have here. Equity demands a case-by-case approach. To apply the maximum balance approach, the receiver needed to make sure that the dean investors were reinvesting the same money that they withdrew. If the receiver couldn't answer this question, then they couldn't apply the maximum balance approach. That's what the maximum balance approach contemplates. The Callahan case in the Eastern District of New York understands the maximum balance approach this way. The two paragraphs in Huber on the maximum balance approach also contemplate that the $50,000 that that hypothetical investor withdrew there was the $50,000 that went back in. Tracing the funds is crucial because if we don't trace the funds, we're allowing the dean investors to withdraw money, hold onto the money for a long time, use it, and then at some point later decide to put it back into the scheme. That's what happened here. Over the three-year period where the dean investors were investing, between the two entities, CCWB and EBC, which I want to get back to in a second, they invested 115 transactions, money in, money out, and then they were taking some of that money and sending it out of their receivership accounts to pay for credit card payments and taxes and distribute to dean They were taking money from alternative sources of cash, over $20 million, and putting it into their receivership accounts. Sometimes they didn't make an investment after a withdrawal for four months, and the money that went in wasn't the same money that they withdrew. But I thought the MC dean investors had a special bank account to deal with the receiverships and that their position is that it would be easily traceable. So the receiver agrees that the administrative difficulty concerns do not necessarily apply to MC dean. But the dean investors, they objected together to the maximum balance approach should be applied to the rising tide method. And so Judge Bennett was considering, should the maximum balance approach be applied to the rising tide method? It was answering this question generally. The distribution plans never single out one investor for individual treatment. So when he answered the question, should we apply the maximum balance approach based on CCWB and EBC, which had incredibly complicated accounts, he decided not to. And just to speak about these three entities for a second. So there's three dean entities that objected to the distribution plan. There's EBC, CCWB, and MC dean. This case was appealed, and EBC, after this case was appealed, decided to withdraw from the appeal. Withdrawing from the appeal does not remove EBC from the equation, right? This court reviews the district court's decision based on the facts that were before it, right? If you're, look, if this court's reviewing for abuse of discretion, you can't change the record and then decide whether the district court abused its discretion because the court wasn't considering those facts. So, and these three entities are not as separate and distinct as the dean investors allege. They retained the same counsel who called them a family-related group. Eric Dean, one of the dean family members, submitted a declaration as the manager for all three entities, right? There was, as in the district court hearing, at the objections hearing, the dean investors counsel explained that essentially there's six individuals, three dean family members, and three other individuals who use these investment vehicles to invest into the Ponzi scheme. So, if they didn't want EBC to be considered when applying the maximum balance approach, then they shouldn't have objected using EBC as a claimant. Like, if this court, if they wanted this court to review the maximum balance approach as it should be applied to CCWB and MC Dean, then that's how they should have objected to the distribution plan. They can't chisel out one claimant from the record below because the facts don't fit their theory anymore. The reason why they removed EBC from the equation is because once they were forced to concede the disbursements out of their receivership accounts as pre-receivership recoveries, EBC was the worst offender. They sent $5 million out of their receivership accounts to who knows where to pay for other things. So, their current recovery, which is the average recovery before the receivership, was basically identical with the receiver's number. So, they don't have any benefit of their approach for EBC, which is why they removed it from the case. You don't have a final order in here to appeal. No, Your Honor. They've appealed, right? But they're not appeals, they're not 1291 final order appeals. That's correct, Your Honor. And do you claim there's no jurisdiction then? No, no, we think there is. You think it's collateral order jurisdiction? We do, Your Honor. Has collateral order jurisdiction ever been applied for something like this for you? Four times. No, Your Honor, this court has good ground to stand on to find that the collateral ordered action applies. There's four circuits. The 5th, 6th, 10th, and 11th have applied to collateral ordered action for orders within their distribution plan. This is an interlocutory appeal, and we normally don't hear interlocutory appeals. That's right, Your Honor. I mean, the reason why the collateral ordered action should be applied here is because if this court were required to wait until the end of the case, the receiver can't hold on to this money forever. So he would have distributed the money, and then it would require potentially, if this court were to reverse Judge Bennett, it would require going to individuals and asking them for the money back. And so, in fairness and judicial efficiency to investors, this court should decide how this money should be distributed now so that it can be distributed to investors. There's not a lot of appeals necessary in order to get the money distributed. That's right, Your Honor. And if this case wasn't appealable at this moment, the receiver would have distributed that money. They can't sit on it forever. There's going to be more times you're going to come up here. I hope this is the last time, Your Honor. Well, if it's not over, you said. That's right. But there's other asks. In terms of the objections to the distribution plan, this will be the last time because the district court already heard that. There are clawback proceedings that the receiver just brought to recover net winnings from the Ponzi scheme, which was a separate complaint filed in district court. And who knows? That could come up here. But that's not related to the distribution plan itself. In terms of that, all the terms of this distribution plan are set. And however, this court decides it, then the money will be distributed and subsequent money covered will be distributed based on the terms of this distribution plan. So to kind of move the process along, the collateral ordered option is important to be applied here. And again, four circuits have applied that. When did we apply it? I'm looking at your page two. This court has never applied. Well, we have not applied. You're correct, Your Honor. You have four circuits that have applied. Correct. Maybe. How many have you got that have not applied? The Ninth Circuit rejected the collateral order doctrine. There you go. There's a split in the circuits. There is. There's a split in the circuits of whether we have jurisdiction. Yes. Heavily weighted to applying the collateral doctrine. Correct. Yeah. And whose idea was it that she got all this extra time to argue? That's yours or the other side? I got a lot of extra time, Your Honor. Pardon? They asked for extra time and then the court threw it on for me also. You don't need a half-iron to argue here. Well, I've only considered, I've only done the Dean Investors. We haven't even gotten to the second circuit. You hadn't even argued the jurisdiction where there was a split in the circuits until I brought it up. Well, it's our position, Your Honor, that it's pretty... We could agree with the Ninth Circuit and everybody go home. You could. Is that the only circuit that's turned it down? Yes, Your Honor. I want to make just one final point on the Dean Investors before turning to the Connaughton Investors, the Connachton Investors. To Judge Keenan's point, the Dean Investors benefited because in two ways. One, they had access to funds. And this is a point that the court in the Northern District of Georgia, CODEM Advisors focused on. They said that access to funds is a benefit. They could spend it, save it, reinvest it however they wanted. But more than access, they benefited because they used the funds, right? They withdrew money from the Ponzi scheme and then they took some of that money and sent it all over the place. And then the money that they reinvested back in was not necessarily the same money that they took out. And tracing the funds is crucial for benefit because if they're going to say they conceded disbursements as pre-receivership recoveries. They're going to say we benefited from this dollar that went in, but not this dollar that came out, then the receiver needs to figure out which dollar was that. Otherwise, we're giving them an advantage over other investors who didn't withdraw funds from the Ponzi scheme. So I would like to move on to Judge Benjamin. I was going to ask you about capital consultants. Sure. Why is that not, they're saying I think in that case it was a 50% moving on to the- We can move on. ... investors. Sure. Why, I mean, this 100%, why is the 50% not work? So 50% could work, but the question here is not what's the most ideal offset provision for collateral recoveries, right? The district court approved and the receiver recommended and the district court approved a collateral offset. And so the question is, was this in the abuse of discretion? Again, we're not restarting and saying what's the best thing to do when investors recover money from collateral sources. We're reviewing the district court for abuse of discretion and the key thread linking all the cases where there was a collateral offset provision is that the court accepted the receiver's recommendation. Sometimes the receiver changed it based on objections and sometimes he didn't, but it was always what the receiver proposed. And so that's what we're dealing with, but the receiver and the SEC thought that 100% offset here made the most sense and Judge Bennett agreed. And so this court has to ask, was that an abuse of discretion? It's not what this court would do if it was starting from scratch. So just to back up a little bit, so offset provisions are a reasonable solution when funds are limited. And this is why many courts have approved offset provisions in equitable receiverships, including 100% offsets as the district court approved here. An investor's collateral recovery necessarily reduces their loss. So ignoring collateral recoveries creates a disproportionate recovery. If the receiver offset, did not offset the collateral recoveries and ignore them completely, the kind of investors would recover 75 to 90% of their investments where everyone else is at a minimum, the four day percent tide. And so by factoring in collateral offsets, it's creating a more equitable distribution where everyone recovers more or less the same amount. And to Judge Benjamin's point, the specifics of other cases are irrelevant, right? The fact that the kind of investors recover more under the facts and terms of other distribution plans doesn't explain how the district court abused its discretion. And to speak about the idea of this topic of incentive, investors are still incentivized to bring third party lawsuits to recover money outside the receivership. And that's because the investors have no assurance that the receiver is going to recover anything, right? Many Ponzi schemes lose their money entirely and the receiver recovers very, very little. Here, the kind of investors filed their lawsuit years before the receiver distributed any assets. And at the time they brought the lawsuit, they had no idea what the receiver would cover, right? The receiver ended up doing a great job. And at a minimum, everyone's going to get a minimum of 49% of their money back. But there are many receiverships where they recover $7, $8 million and it's a 10, 12, 15% recovery. So if it played out differently and the receiver did recover as much as he did, the Connaughton investors would have recovered much more than other investors. And as it stands, they recovered $170,000 more than if there was no collateral offsets recovered and considered, then they would have had they done nothing and just waited to see what would happen in the receivership. And when we're talking about recovering half the money, 50%, a 10% increase in recovery is not insignificant. And so they made the choice to pursue these third-party litigation. And just to discuss the third-party litigation for a second, the council says the collateral source rule should be applied. And it shouldn't be applied for two reasons. One, the policy underlying the collateral source rule has no application here. The purpose of the collateral source rule, this litigation principle, is that we don't the defendant a windfall or a benefit by giving them credit for something that the plaintiff contracted for, insurance or whatever it is. But here, a collateral offset provision doesn't relieve the defendants, the ones who are sitting in prison, of the consequences of their conduct. It just affects how limited receiver assets are distributed to innocent investors. And second, the reason why it doesn't apply is because the Bethesda Group feeder fund is not completely independent of the receivership. The Bethesda Group was led by this guy, Gary Day, who basically was working for Kevin Merrill to send him money. He called him his very best friend, and he received payouts of 85% to 100%, whereas the other investors are receiving 15%. And so they were also net winners from the Ponzi scheme, which means that the money that was distributed to them exceeded their total investments. And the receiver just initiated clawback proceedings to recover these net winnings, which included some of the Bethesda Group members. And they previewed that they intend to argue that they get a set off for the settlement funds that they paid to the competent investors. And so they are going after the same parties that the receiver is going after. And if we're going to say that that's OK, that investors can pursue net winners from assets that belong in the receivership estate to be distributed to other investors. And so it would create this detrimental race to the courthouse. And just one more point. The competent investors say that the bankruptcy rule could apply where creditors do not have to offset their collateral recoveries. And that also doesn't require that collateral recoveries be ignored here. Equity receiverships have much more flexibility than bankruptcy, which is governed by the Bankruptcy Code to distribute limited assets. And so that also doesn't require this court to ignore collateral offsets. If there's no further questions, I'll get back. I want to ask you about this jurisdiction. Sure. You didn't move to dismiss the appeals. No, Your Honor. You say they do have jurisdiction under the collateral order doctrine. Right. And also, you say they have jurisdiction under 1292A2? No, just the collateral order doctrine, Your Honor. You don't agree with the A2 thing? I do not. Did anybody ask Judge Bennett to certify a 1292B appeal? It was not for this proceeding. We did. The receiver asked for another aspect of. You can get the district judges into these things. And for a controlling question of law, when there's grounds for difference of opinion, you can get an interlocutory appeal. It would have been wise to ask. He approves it. Here, he didn't approve it. Not for this appeal. It would have been wise to do so. We did for another. They appealed and you acquiesced. Right. I mean, we didn't tell us until you filed your brief. We would also like this court to decide the appeal because we're sitting on $9 million, which we're waiting for this court to decide to distribute. It's not a final. Yes, Your Honor. All right. Thank you. Thank you very much. The questions. Let me see if you have questions. Oh, Judge Keenan. Judge Benjamin. Okay. Thank you. Thank you very much. We appreciate your work. Let me see here. Now, we're going back to Ms. Miller. Your Honor. Mr. Solomon states, well, the question here is whether there's an abuse of discretion, not whether this could have been done better or been done worse. And he's literally correct. That is the standard review applicable here. But my question for him would be, if this isn't an abuse of discretion, what is? When does the receiver overstep his or her discretion in crafting a plan of distribution? And in our opinion, the receiver, well, it's not an opinion. It's a fact the receiver has broken new ground, at least with respect to the limited body of prior federal cases concerning offsets and receivership distributions. He's broken new ground, doing a 100% offset with no mitigating elements. The two prior cases that are cited in the papers with 100% offsets, one of them treated the money recovered in the collateral recoveries as money not put in. And the other one was in a net loss calculation receivership. Now, we are agnostic as to whether the receiver should or should not have used the rising tide versus the net loss method. But one thing we are not agnostic about is that in a rising tide calculation and a 100% offset is much more devastating to the claimants against whom it is implicated. So a 100% offset in a net loss calculation won't have as much of an adverse effect. So this is the first case that we are aware of and that anybody has cited in which a receiver has tried to do a 100% offset with no mitigating elements. That is new ground, and that is an abuse of discretion. The receiver suggests that, well, normally claimants can't be sure they're going to get anything in a receivership. And is he literally correct? Yes, there may be circumstances in which it's not assured. But I would say it was pretty much assured in this one. When the receiver was appointed, he was sitting on existing portfolios of consumer debt, probably worth $30 to $40 million. Now, Kevin Merrill lied to the world about how many of these portfolios he had. He claimed he had hundreds of millions of dollars of them and pledged them to lots of different groups. He committed a lot of fraud, but he actually did own a bunch of property. And the receiver comes in and is sitting on $40 million on day one. He's sitting on a bunch of luxury cars. He's sitting on a bunch of real estate. The receiver is sitting on a mountain of assets before he had to lift a finger, whereas I had to litigate on a contingency fee to scrape together several hundred grand for my clients. So my clients had every reason. Do you think all that's relevant to what we're doing here? Well, he said it's relevant. What's your theory of your jurisdiction come up here? Well, Your Honor, we asserted in our final order. Correct. It's appealable under 1292A2. You say 1292A2? That's the first base. We assert two bases for jurisdiction, one of them. He disagrees with that. He disagrees with that. And we did not present very detailed briefing on the issue. We're happy to do so. We cited in our brief the three cases, which counsel for the receiver referred to, and the three circuits that had endorsed jurisdiction under the collateral order doctrine. And we agree with that. And again. He argues fairness. Is that good enough to give you jurisdiction under the collateral order doctrine? Well, I don't. In my experience, fairness is not necessarily a consideration. I think it has to do with the practicability of being able to take an appeal after a final judgment. And if people are not allowed to appeal decisions relating to distributions, it could have an adverse effect on managing a receivership and slow things down considerably for a lot of people. So we do think it fits squarely within the collateral order doctrine. I don't think it has to do with fairness. I think it has to do with pragmatic concerns of whether an appeal could properly be effected in the ordinary course after a final judgment. Finally, I do want to respond with all due respect to one comment Your Honor made that maybe people should have known better. I think the pool of claimants in this receivership, I think the receiver will agree, is pretty diverse from people who lost as little as $10,000 to very sophisticated people who lost millions. And I have clients that run a pretty good range of that spectrum. The client with the largest loss I represent, who we identify as Objector 1 on page GA313, lost almost $400,000. He's not a very sophisticated man. He runs a landscaping company in Latin County, Virginia, and he happened to do very well for himself. He was taken to the cleaners by a bunch of sharks who take people to the cleaners for a living, namely Kevin Merrill and Gary Day. And should he have known better? I don't know. The man's a landscaper. And again, he was taken to the cleaners. And that's the kind of person I represent. Thank you, Your Honor. Thank you. Ms. Glattenberg? Thank you. It is the receiver who has relied extensively on Judge Posner's decision in Huber as authority for this distribution plan. And we are also relying on Huber. And DICTA is not the issue here. It's the wisdom of treating reinvested amounts as rescinded, as Judge Posner points out. And Judge Bennett set this up, set up this issue for this court to address by putting these $9 million aside to deal with these claims. Judge Posner in Huber was speaking to a later court, this court, when he said there's a need to pause and consider how to fairly treat reinvestments under the rising tide methodology. And Ponzi schemes, whether it's Madoff, this one, the next one, they involve reinvestments. And this is an issue that needs to be addressed. It's not fair to treat amounts that are reinvested and lost as having been recovered. Judge Benjamin is correct to point out the circumstances of M.C. Dean. At a minimum, the district court must be reversed as to M.C. Dean because it is an abuse of discretion to find administrative difficulty as to M.C. Dean. There's nothing in the record to support that. And the receiver concedes and acknowledges that there's no administrative difficulty with respect to applying Posner's approach to M.C. Dean. Your theory, you have jurisdiction over, come up here with an interlocutory appeal. We agree that the collateral order doctrine applies. It would be effectively unreviewable if we had to wait to the end of all the distributions to challenge the distribution plan. Because at that point, all the money's been distributed. That satisfies the collateral order doctrine. That's one of the factors, yes. I think it's also telling that the receiver relies so heavily on E.B.C., a dismissed party, here. The facts that were before the district court were that these were three separate entities. And the receiver, up until this appeal, has treated them all separately. They have a separate distribution line in the distribution plans, separate transaction schedules. The declarations in support of the receiver's reply in the district court treat them separately. Our objections treat them separately. The fact that he's insisting on including E.B.C. is just showing that he needs to include those numbers to make this much more confusing than it is. There are certain facts here that are not in dispute. The amount invested, the total amount invested, the amount taken out. And the receiver also doesn't dispute that most of that went back into the Ponzi scheme. That's at JA 503 at the hearing. The receiver's counsel said, yes, we agree. CCWB and MCD reinvested their withdrawals. But it still goes ahead and treats them as having kept and retained these withdrawals when they did it. And just using the receiver's numbers, you can apply Judge Posner without any need for tracing. Money is fungible. It doesn't make sense to trace. And the receiver's own expert says money is fungible. That's the point. You can't trace this dollar in, this dollar out. And we agree that amounts that were used for purposes other than investing in the Ponzi scheme, these so-called disbursements, we agree. Those are counted as recovery. Those count against CCWB and MCD's amount that they get under the distribution plan. What we're talking about here are amounts that went back in and were lost and were not used for their other purposes. And so I think just going back to Judge Posner, he recognized that reinvested funds are a significant part of a typical Ponzi scheme. And he's urging later courts to pause and consider how to fairly treat these. And he says, treat these as rescinded. So the amounts that went in and the amounts that came out, you just ignore them in order for this to be fair. Otherwise, these investors are being treated unfairly and as being unfairly having recovered amounts that they didn't ever get. So we believe the, we ask this court to reverse the district court order as to MCD and CCWB and remand for application of Judge Posner's method with respect to reinvested amounts. Thank you very much. Thank you very much, Ms. Blattenberg. We appreciate the arguments of counsel. We'll take the case under advisement. The, at this point, we're going to take a brief recess, Madam Clerk. Then we'll come back and hear the next two cases. This honorable court will take a brief recess.
judges: Robert B. King, DeAndrea Gist Benjamin, Barbara Milano Keenan